UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PATRICIA CAVALLARO, on behalf of herself and all other employees similarly situated,  )<br>  )<br>  )<br>  )<br>Plaintiff,  )<br>  )<br>v.  )<br>  )<br>UMASS MEMORIAL HEALTH CARE, INC., et al.,  )<br>  )<br>Defendants.  )<br>  ) | Civil Action No.<br>09-40152-FDS |

## MEMORANDUM AND ORDER ON PARTIAL MOTION TO DISMISS

**SAYLOR, J.**

This is an employment dispute about compensation for extra time worked. Plaintiff Patricia Cavallaro, on behalf of herself and all other employees similarly situated, brought suit against various related hospitals and health-care providers and two healthcare executives. She contends that defendants employ a variety of policies to deny employees compensation for time worked during meal breaks and before and after shifts. The complaint seeks relief under the Fair Labor Standards Act ("FLSA"). 29 U.S.C. § 201 *et seq*.

Pending before the Court are defendants' motions to dismiss all claims against all defendants except UMass Memorial Medical Center, Inc. and to dismiss or strike collective action allegations.[1]

---

[1] In a letter dated August 13, 2012, and submitted to the Court as Exhibit A to plaintiff's opposition brief, plaintiff agreed to withdraw her request for injunctive relief. The Court will accordingly treat the request as withdrawn. Defendants also moved to stay discovery proceedings pending the Court's ruling on the partial motion to dismiss. That motion will be denied as moot.

I.  **Background**

   A.  **Factual Background**

Unless otherwise indicated, all facts are stated as set forth in the complaint.

Plaintiff Patricia Cavallaro worked at UMass Memorial Medical Center in Worcester, Massachusetts, as an hourly employee from August 2002 until December 2008. (Compl. ¶¶ 10, 101). During that time, she was employed as a registered nurse in the Cardiac Telemetry Unit. (Compl. ¶ 101). She received her paychecks from UMass Memorial Medical Center. (*Id.*).

Cavallaro purports to represent a class of some 13,000 similarly situated individuals who were not paid by defendants for all the hours they worked. (Compl. ¶¶ 5-6). According to the complaint, this class includes the following hourly employees:

> secretaries, housekeepers, custodians, clerks, porters, registered nurses, licensed practical nurses, transport nurses, nurse aides, administrative assistants, anesthetists, clinicians, medical coders, medical underwriters, nurse case managers, nurse interns, nurse practitioners, nurse aides, practice supervisors, professional staff nurses, quality coordinators, resource pool nurses, respiratory therapists, senior research associates, operating room coordinators, surgical specialists, admissions officers, student nurse techs, trainers, transcriptionists, occupational therapists, occupational therapy assistants, physical therapists, physical therapy assistants, radiation therapists, staff therapists, angiotechnologists, x-ray technicians, CAT scan technicians, mammographers, MRI technologists, sleep technologists, surgical technologists, radiographers, phlebotomists, respiratory technicians, respiratory care specialists, respiratory care practitioners, clinical coordinators, medical assistants, home care nurses, home health aides, clinical case managers, midwives and other health care workers.

(Compl. ¶ 131).

The complaint alleges that Cavallaro worked time in addition to her scheduled shifts for which she did not receive compensation. For example, Cavallaro performed her regular duties during her meal breaks, without compensation. (Compl. ¶ 101). These duties included charting,

responding to codes, answering questions from nurses or physicians, and attending in-service trainings.  (*Id.*).  She also worked for approximately 15-30 minutes before each shift, and approximately 30-45 minutes after each shift, without compensation.  (*Id.*).  Her tasks during that time included reading and creating charts and reports, as well as preparing and distributing medication.  (*Id.*).

Defendants UMass Memorial Health Care, Inc.; UMass Memorial Hospitals, Inc.; UMass Memorial Medical Center, Inc.; HealthAlliance Hospitals, Inc.; Marlborough Hospital; Clinton Hospital Association; and Wing Memorial Hospital Association are hospitals and health-care providers.  According to Cavallaro, they are related organizations with common membership, governing bodies, trustees, officers, and benefit plans.  (Compl. ¶ 10).

The complaint alleges a number of ways in which defendants operate as a cohesive system.   The hospitals represent themselves in publications as an integrated health care system.  (Compl. ¶ 20).  They have centralized financial, payroll, and health records systems (Compl. ¶ 24); use a centralized website for job postings (Compl. ¶ 25); and maintain system-wide employee-benefit plans and human-resources policies (Compl. ¶ 28).  In addition, the complaint alleges that a single Board of Trustees oversees the entire system.  (Compl. ¶ 30).

According to the complaint, UMass Memorial Health Care, Inc. ("UMMHC") is the "parent" company of all other corporate defendants.  (Compl. ¶ 27).  UMMHC's Form 990 form indicates that the company owns hospital facilities including UMass Memorial Medical Center, Inc.; HealthAlliance Hospital; Marlborough Hospital; Clinton Hospital Association; and Wing Memorial Hospital Corporation.  (Compl. ¶ 32).

Defendants John O'Brien and Patricia Webb are executive officers employed by one or

more of the defendants.  According to the complaint, O'Brien is the President and CEO of "UMass," a term it defines as describing all corporate defendants collectively.  (Compl. ¶ 40).  It further alleges that O'Brien has operational control over an integrated health-care system, including all defendants, and makes decisions that concern the policies (including human-resources policies) that the different hospitals adopt and implement.  (Compl. ¶¶ 41, 44).  It alleges that he has authority to oversee employment decisions, including hiring and firing, and to make decisions concerning employees' schedules, standard benefit levels, and maintenance of payroll-record systems.  (Compl. ¶¶ 52, 56, 64-66).

According to the complaint, defendant Patricia Webb was an executive officer who was employed by one or more of the defendants until 2010.  It alleges that Webb was the Senior Vice President and Chief Human Resources Officer of "UMass," again defined as describing all corporate defendants collectively.  (Compl. ¶ 74).  It further alleges that she was responsible for and authorized to direct all aspects of human-resources functions for all defendants.  (Compl. ¶ 75).  It alleges that she counseled defendants on employment decisions, including hiring and firing; helped set employees' schedules, hours, and standard benefit levels; was actively involved in drafting human-resources policies and overseeing compliance with those policies and with federal law; and had the authority to hire and fire employees.  (Compl. ¶¶ 80, 81, 83, 86, 94).

The complaint alleges that defendants violated various statutory duties by failing to compensate Cavallaro and those similarly situated for all time worked.  It alleges two unlawful practices:  (1) automatically deducting time from each employee's paycheck for meal breaks, even if the employee did not actually receive such a break, and (2) failing to compensate employees for work completed before and after their shifts.

B.   **Procedural Background**

Plaintiff (along with a second named plaintiff, Monique Herman) filed the original complaint on September 3, 2009, alleging causes of action under ERISA, RICO, and the FLSA. In July 2010, the Court granted defendants' motion to dismiss the RICO claim. Plaintiffs' second amended complaint was filed in January 2011. In June 2011, the Court granted defendants' motion for judgment on the pleadings on the ground that the plaintiffs had failed to allege an actual employment relationship with any of the named defendants. *Cavallaro v. UMass Mem. Health Care Inc.*, 2011 U.S. Dist. LEXIS 61003 (D. Mass. June 8, 2011). Plaintiffs appealed; the First Circuit reversed and remanded the case to allow for "one last amendment." *Cavallaro v. UMass Mem. Healthcare, Inc.*, 678 F.3d 1, 10 (1st Cir. 2012).

On July 7, 2012, plaintiff Cavallaro filed a third amended complaint, focused solely on defendants' alleged FLSA violations.[2] The complaint includes collective-action allegations. Defendants have moved to dismiss claims against all defendants except UMass Memorial Medical Center on the grounds that the complaint fails to plead employer status, standing, or any claims on behalf of the putative class members.

II.   **Standard of Review**

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S.

---

[2] Monique Herman, the other named plaintiff in the original complaint, is no longer named in the third amended complaint.

544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if plaintiff's well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharms., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (quotations and original alterations omitted).

A motion to strike collective action allegations is also analyzed under the 12(b)(6) standard. *See Manning v. Boston Med. Ctr. Corp.*, 2012 U.S. Dist. LEXIS 54692 at *4 (D. Mass. Apr. 18, 2012); *Bessette v. Avco Financial Services, Inc.*, 279 B.R. 442, 450 (D. R.I. 2002).

### III.  Analysis

#### A.  Standing

Standing is a threshold question in every case; "[i]f a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case." *United States v. AVX Corp.*, 962 F.2d 108, 113 (1st Cir. 1992). To satisfy the case-or-controversy requirement of Article III of the United States Constitution, plaintiff bears the burden of alleging facts sufficient to establish that she (1) has suffered an "injury-in-fact," (2) that the injury is "'fairly traceable' to the actions of the defendant," and (3) that the injury will likely be redressed by a favorable decision. *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Inclusion of class allegations does not relieve a plaintiff of the requirement that she allege that she personally has suffered an

injury, fairly traceable to the challenged action of the defendants. *See Warth v. Seldin*, 422 U.S. 490, 502 (1975).

By alleging that she worked time for which she did not receive compensation, plaintiff clearly sets forth a sufficient injury-in-fact to satisfy the first requirement. However, it is less obvious that plaintiff has satisfied the second and third elements—traceability and redressability—as to all nine defendants. It is uncontested that liability in the context of the FLSA is predicated on the existence of an employer-employee relationship. Accordingly, plaintiff's injuries are only traceable to, and redressable by, those defendants who are deemed by law to have employed her.

Plaintiff does not allege that she was directly employed by any defendant other than UMMMC. Rather, she alleges that the seven corporate defendants are engaged in the operation of a health-care system as a single, integrated enterprise. She asserts that, as such, they constitute a "joint employer" as that term is understood under the FLSA, and are therefore jointly and severally liable for violations of the FLSA.

Defendants contend that plaintiff's allegations of an integrated "enterprise" is insufficient to support standing as to the defendants other than UMMMC. Even accepting the allegations as true, defendants argue that the existence of a "common enterprise" is irrelevant to the question of liability under the FLSA, and therefore cannot provide a basis for standing. They point to a district court case in which the court found allegations of defendants' involvement in a "common enterprise" to be unrelated to the existence of an employer-employee relationship, and therefore insufficient to create standing to sue under the FLSA. *See Martin v. BMS Enterprises*, 2010 U.S. Dist. LEXIS 66050, at *15 n.8 (N.D. Tex. July 1, 2010) ("Although the Blackmon Mooring

defendants may be part of a common enterprise with plaintiffs' employer or employers, FLSA liability is predicated only on an employee-employer relationship, not on defendants' involvement in a common enterprise.").

Plaintiff's argument here is distinguishable from that made by the plaintiffs in *Martin*. There, plaintiffs argued that they had standing simply because the named defendants constituted a single enterprise, without alleging any connection between the enterprise and defendants' status as an employer. Here, plaintiff does not suggest that the existence of a single enterprise is, by itself, sufficient. Rather, plaintiff asserts that defendants collectively constitute a "joint employer" for the purposes of the FLSA, which therefore makes them her employers as that term is understood in the FLSA context.

If plaintiff is correct, then she was "employed" by all defendants for the purposes of the FLSA, and has sufficiently alleged an injury, traceable to defendants, that would be redressed by a favorable decision. Thus, the question of plaintiff's standing turns on whether she has sufficiently alleged that she was "employed" by defendants, as that concept is interpreted in the context of the FLSA.

### B. Employer Status of Corporate Defendants

The FLSA provides broad and comprehensive coverage of employees. *United States v. Rosenwasser*, 323 U.S. 360, 362 (1945). Indeed, the Supreme Court has indicated that "[a] broader or more comprehensive coverage of employees . . . would be difficult to frame." *Id*. However, the statute's reach is not without limits. The FLSA applies only to those persons who are "employed" by an "employer." 29 U.S.C. §207(a)(1). To "employ" is defined as "to suffer or permit to work." 29 U.S.C. §203(g). An "employer" is defined as "any person acting directly

or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. §203(d). Liability under the FLSA is thus predicated upon the existence of an employer-employee relationship. However, there may be multiple "employers" of one employee, all of whom are simultaneously liable for compliance. *Chao v. Hotel Oasis, Inc.*, 493 F.3d 26, 34 (1st Cir. 2007).

In determining whether an employment relationship exists for the purposes of the FLSA, courts look "not to common law conceptions of that relationship, but rather to the economic reality of the totality of the circumstances bearing on whether a putative employee is economically dependent on their alleged employer." *Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d 668, 675 (1st Cir. 1998) (internal quotations omitted). The First Circuit has set forth four factors that are relevant to this analysis: whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. *Id.* (citing *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983)).

Plaintiff contends that the rigid use of these factors in evaluating the existence of an employer-employee relationship is inappropriate. According to plaintiff, the factual circumstances in *Baystate* lent themselves to the application of the factors cited by the court, but those factors are poorly suited to evaluate the existence of an employer-employee relationship in all cases, and here in particular. She urges the court to focus on the totality of the circumstances, rather than a mechanical application of the *Baystate* factors, and proposes an additional list of factors for the court to consider: (1) whether the employers are "completely disassociated" with respect to the employment of the individuals; (2) whether one employer is controlled by another

or the employers are under common control or management; (3) whether the employers maintain interrelation between operations; (4) whether there is centralized control over labor relations among the employers; (5) whether there is common ownership among the employers; (6) whether the employers share common insurance, pension, or payroll systems; and (7) whether the employers share common hiring, seniority, recordkeeping, or billing systems.  (Pl. Opp. Br. at 9).

Plaintiff cites to a number of authorities in support of this proposition.  However, none of those references provide a persuasive reason for diverging from the First Circuit's analysis in *Baystate*.  Two of the authorities cited by plaintiff address the factual situation, not pleaded here, where a single employee has provided work for two or more related employers during the same workweek.  *See* 29 C.F.R. § 791.2 (addressing the separate employment by two or more employers of one employee); U.S. Dep't of Labor, Wage & Hour Div., Opinion No. FLSA2005-17NA, 2005 WL 6219105 (June 14, 2005) (analyzing the question of joint employment in a factual circumstance in which an employee, during the same workweek, worked for two separate facilities operated under the same business name and managed by the same company).  Neither authority stands for the proposition that any two companies that are not completely disassociated are, by definition, jointly and severally liable for any FLSA violations concerning any employee.  Nor do they suggest that the factors they set forth are equally applicable in a factual circumstance like that presented here, where there is no allegation that the plaintiff was ever employed at more than one facility.

Plaintiff's argument also muddles the proper method for analyzing multiple-company liability as joint employers with the separate question of whether they may constitute a single

enterprise for FLSA coverage.  Plaintiff cites to a Ninth Circuit case, *Chao v. A-One Medical Servs.*, 346 F.3d 908 (9th Cir. 2003), and a Supreme Court case, *Radio and Television Broadcast Technicians Local Union 1264 v. Broadcast Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965), as supporting the use of these factors to determine the liability of multiple employers under the FLSA.  But that reliance is misplaced.  Both cases focused on whether two entities constitute a "single enterprise" for jurisdictional coverage, not the liability of those employers for FLSA violations.  Indeed, the court in *A-One Medical* specifically acknowledged that the jurisdictional question of coverage is separate and distinct from the question of liability as joint employers. 346 F.3d at 917; *see also Cornell v. CF Ctr., LLC*, 410 Fed. Appx. 265, 267 (11th Cir. 2011) ("The finding of an enterprise is relevant only to the issue of coverage.  Liability is based on the existence of an employer-employee relationship.").

      Finally, plaintiff cites to a Second Circuit case, *Clinton's Ditch Cooperative Co. v. National Labor Relations Bd.*, 778 F.2d 132 (2nd Cir. 1985).  That opinion contains an extensive discussion of the difference between a "single enterprise" situation and a "joint employer" relationship, as well as the variety of tests adopted by circuit courts in making that determination.  Ultimately, the court set forth five factors that it weighed in reaching its conclusion that joint employer status was absent:  (1) who played a role in hiring and firing; (2) who administered discipline to employees; (3) who maintained records and handled pay, insurance, benefits, and records; (4) who conducted day-to-day supervision; and (5) who participated in the collective bargaining process.  By this Court's reading, these factors have far more in common with the First Circuit's *Baystate* analysis than they do with plaintiff's proposed factors.

In short, plaintiff has provided no valid basis for finding that the *Baystate* analysis is inappropriate here. Accordingly, the Court will apply test for joint employer status as set forth in the First Circuit's opinion in *Baystate*.

### 1. **Power to Hire and Fire**

The first *Baystate* factor is whether the alleged employer had the authority to hire and fire workers. In *Baystate*, it was undisputed that the company was solely responsible for hiring and firing certain workers, and had the power to keep workers off the job site if the company was not satisfied with their performance. 163 F.3d at 675-76.

Here, the amended complaint makes no specific allegations that any corporate defendant other than UMMMC had the power to hire or fire her. She was employed from 2002 until 2008 as a nurse at UMMMC. (Compl. ¶ 101). She received all paychecks from UMMMC. (*Id.*). The complaint does not allege that any other corporate defendant was involved in hiring her. Nor does it allege that any of the other alleged employers had the authority to fire her. Accordingly, the complaint pleads no facts relevant to the first *Baystate* factor as to any defendant other than UMMMC.

### 2. **Supervision and Control of Employee Work Schedules and Conditions of Employment**

The second *Baystate* factor is whether the alleged employer exercised control over work schedules and conditions of employment. The *Baystate* court noted many different ways in which the alleged employer supervised and controlled employees: it "dictated the times at which workers were to report . . . ; screened workers for minimum qualifications; decided which workers would be assigned to particular job sites; sometimes transported workers to job sites at client companies; instructed workers about appropriate dress and work habits; and forbade

workers from contacting directly a client company about potential job opportunities." *Baystate*, 163 F.3d at 676.

Here, the complaint does not make any specific allegations that any corporate defendants other than UMMMC supervised plaintiff or exercised control over her schedule or the conditions of her employment. The complaint does make a general allegation that "[d]efendants jointly managed and controlled this venture as well as its employees and assets." (Compl. ¶ 36). It also alleges that UMMHC is the "parent" company to UMMMC. (*Id.*). Although these assertions implicate the corporations' control over UMMMC employees, such conclusory statements are insufficient to suggest that any other corporate employer actually exercised authority over plaintiff's work. Again, the complaint pleads no facts relevant to the second *Baystate* factor as to any defendant other than UMMMC.

### 3.     Determination of the Rate and Method of Payment

The third *Baystate* factor is the degree of control the putative employer exercised over the economic aspects of plaintiff's employment. The *Baystate* court noted that the putative employer determined the worker's hourly wages, chose a method of payment, collected time sheets, and issued worker's paychecks. 163 F.3d at 676.

The complaint here arguably sets forth plausible allegations concerning UMMHC's control over the economic aspects of plaintiff's employment relationship. In particular, the complaint alleges that UMMHC is a "parent" company to all other corporate defendants; that the corporate defendants' labor relations and human resources are centrally controlled; that this centralized control extends to system-wide policies and employee-benefit plans; and that each component entity implements the policies as a result of this centralized control (Compl. ¶¶ 27,

28, 33, 34). At this stage of the proceedings, these allegations would support a reasonable inference that UMMHC was at least partly responsible for determining how, and how much, plaintiff was paid.

The complaint does not, however, set forth any similarly plausible specific allegations as to the remaining five corporate defendants. There is no allegation that any of the other entities exercised authority in setting the system's alleged uniform policies. There is no allegation that any of these entities determined how plaintiff would be paid, how much she would be paid, or whether she would receive overtime compensation. There is no allegation that any of these entities participated in setting benefit levels or distributing benefits to her. Absent such allegations, the mere assertion that the corporations followed uniform policies is not sufficient to support any reasonable inference that they exercised control over her compensation.

### 4. Maintenance of Employment Records

The final *Baystate* factor is whether the alleged employer maintained employment records for all employees.[3] Here, the complaint alleges that defendants have centralized records, including payroll records. (Compl. ¶ 24). It also alleges that defendants use a centralized, web-based human resources tool for employees, called HR*Connect*. (Compl. ¶ 29). While these allegations would support a reasonable inference that all defendants may have *access* to plaintiff's employment records, they do not indicate that any particular defendant (other than, perhaps, UMMMC) plays an active role in *maintaining* her records. Without any evidence of active involvement, the facts as pleaded do not indicate that any defendant other than UMMMC exercised control over the economic aspects of plaintiff's employment relationship.

---

[3] In *Baystate*, the company touted the advantages of having the company handle paperwork and records to clients in its advertising materials. 163 F.3d at 676.

### 5. Summary of the *Baystate* Factors

In sum, the complaint has not set forth any specific allegation that implicate any defendant other than UMMMC (which directly employs her) and possibly UMMHC (the parent company of UMMMC). The complaint provides no basis for finding that an employer-employee relationship existed between any of the other defendants and plaintiff. Absent such a relationship, there is no allegation that plaintiff's injuries are fairly traceable to those defendants, nor is there any allegation that a favorable decision against those defendants would redress her alleged injuries. Plaintiff therefore lacks standing to assert claims against those five defendants. Accordingly, defendants' motion to dismiss will be granted as to UMass Memorial Hospitals, Inc.; HealthAlliance Hospital; Marlborough Hospital; The Clinton Hospital Association; and Wing Memorial Hospital Corporation.

The complaint does include allegations against UMMHC that are relevant to one of the *Baystate* factors. In particular, it alleges that UMMHC had some authority to determine the rate and method of her payment. However, based on the totality of the circumstances, that one factor is not sufficient to demonstrate that plaintiff was "economically dependent" on the alleged employer. Simply put, the complaint does not set forth a plausible claim that UMMHC exercised sufficient control over her employment conditions to be considered an employer under the FLSA. Accordingly, plaintiff also lacks standing to assert claims under the FLSA against UMMHC.

### C. Employer Status of Individual Defendants

An individual corporate officer can be an employer along with a corporation, and thus can be jointly and severally liable under the FLSA. *Donovan v. Agnew*, 712 F.2d 1509, 1511

(1st Cir. 1983). However, the First Circuit has repeatedly indicated that "not every corporate employee who exercised supervisory control should be held personally liable." *Chao v. Hotel Oasis, Inc.*, 493 F.3d 26, 34 (1st Cir. 2007); *see also Donovan*, 712 F.2d at 1512-13. The "economic reality" test also governs the analysis for determining whether individuals are employers under the FLSA, but focuses on "the role played by the corporate officers in causing the corporation to under-compensate employees and to prefer the payment of other obligations and/or the retention of profits." *Baystate*, 163 F.3d at 677-78.[4]

Plaintiff alleges that John O'Brien is the President and CEO of "UMass" and that Patricia Webb was the Senior Vice President and Chief Human Resources Offices of "UMass" until 2010. (Compl. ¶¶ 40, 74). "UMass" is a term used in the complaint to refer to a collective amalgamation of all seven corporate defendants. (Compl. ¶ 10). The complaint does not include any specific allegations as to which entity employed the individual defendants.

In dismissing the second amended complaint, this Court previously made clear that "[b]efore the Court can determine if an officer exerted control over employee compensation (and by extension, plaintiff's compensation) within a corporate entity, it must be possible to identify which entity employed . . . the individual defendants." *Cavallaro v. UMass Mem. Health Care, Inc.*, 2011 U.S. Dist. LEXIS 61003, at *18 (D. Mass. June 8, 2011). Despite this clear notice, the complaint still fails to allege an actual corporate entity, defined as such by something other than plaintiff's complaint, that actually employed the individual defendants.

---

[4] Several factors are relevant to the personal liability analysis. They include an individual's (1) significant ownership interest; (2) degree of control over the corporations' day-to-day functions, including employee compensation; and (3) personal role in business decisions that contributed to the alleged FLSA violations. *Baystate,* 163 F.3d at 677-78. Because the complaint does not allege which corporate entity employed plaintiffs, the Court need not assess whether the complaint alleges that the individual defendants exercise such significant control over that entity's day-to-day operations and such direct involvement in that entity's relevant business decisions that they could be found personally liable for their actions.

It is possible that O'Brien and/or Webb were employed by UMMMC, the one entity against whom plaintiff has plausibly alleged FLSA violations. However, it is also possible that they were employed by one of the other six corporate defendants, or by some other entity entirely. To survive a motion to dismiss, a complaint cannot simply raise the sheer possibility that the named individual defendants were corporate officers of plaintiff's employer. Plaintiff had clear notice, based on this Court's prior ruling, that the Court could not determine a corporate officer's liability under the FLSA without knowing which entity employed that officer. Plaintiff nonetheless has not set forth any allegations in the complaint that identify defendants' employer, nor any facts that support an inference that defendants were directly involved in causing UMMMC's alleged FLSA violations. Thus, the claims against both individual defendants will be dismissed.

### D. Collective Action Allegations

Section 216(b) of the FLSA permits employees to recover unpaid overtime compensation by suing an employer "on behalf of . . . themselves and other employees similarly situated." 29 U.S.C. §216(b). There are two requirements for a representative action: first, the plaintiffs must actually be similarly situated, and second, all plaintiffs must signal in writing their affirmative consent to participate in the action. *Manning v. Boston Med. Ctr. Corp.*, 2012 U.S. Dist. LEXIS 54692 at *7-8 (D. Mass. Apr. 18, 2012).

Defendants have moved to dismiss or strike all collective action allegations in this case. They contend that plaintiff has not adequately pleaded the collective action claims, and that the alleged class is too broad. Plaintiff cites a number of district court cases for the proposition that it is premature to consider whether a named plaintiff is similarly situated to putative plaintiffs on

a motion to dismiss. *See, e.g., Myers v. Medquist, Inc.*, 2006 WL 3751210 at *4-5 (D.N.J. Dec. 20, 2006). Plaintiff urges the Court to defer a decision on the sufficiency of the collective action allegations until a motion for conditional certification has been filed.

Courts generally will not conduct a full inquiry into collective action allegations at this stage, but collective action claims must nonetheless create a plausible entitlement to relief by putative class members to survive a motion to dismiss. *Cf. Landry v. Peter Pan Bus Lines, Inc.*, 2009 U.S. Dist. LEXIS 129873 at *3 (D. Mass. Nov. 20, 2009). In order to proceed, a plaintiff must properly allege a factual basis showing that there are similarly situated persons entitled to relief pursuant to 29 U.S.C. § 216(b) and/or that common issues of fact predominate sufficiently to satisfy the traditional Fed. R. Civ. P. 12(b)(6) standard. *Id.* (citing *Iqbal v. Twombly*, 556 U.S. 662 (2008)). While the FLSA does not define the term "similarly situated," plaintiffs may survive a motion to dismiss if they at least "provide a modest factual showing sufficient to demonstrate that they and potential plaintiffs . . . were victims of a common policy or plan that violated the law." *Zhong v. August August Corp.*, 498 F. Supp. 2d 625, 630 (S.D.N.Y. 2007).

Plaintiff alleges that the class she seeks to represent consists of hourly employees employed in more than fifty different jobs. (Compl. ¶¶ 6, 131). The putative class includes persons who, like the named plaintiff, worked as registered nurses and were compensated at an hourly rate. (Compl. ¶ 131). It also includes a wide variety of other hourly employees, including technicians, secretaries, custodians, clerks, porters, and medical underwriters. (*Id.*). The complaint alleges that all members of the alleged class were subject to defendants' uniform "Meal Break Deduction Policy," whereby defendants' timekeeping system automatically deducted time from employees' paychecks each day for meals and other breaks. (Compl. ¶ 107).

It further alleges that all members of the putative class were subject to a uniform "Unpaid Pre- and Post-Schedule Work Policy," whereby they were required to perform uncompensated work before and after their scheduled shifts. (Compl. ¶ 141).

The Court is skeptical that plaintiff will be able to demonstrate that such a broad group of putative class members are so similarly situated that common issues of law or fact would predominate if the collective action claims were to go forward. Indeed, the complaint itself undermines any suggestion that putative plaintiffs are similarly situated. Plaintiff sets forth specific factual allegations of the type of work she performed during her meal breaks and before and after her scheduled shifts, including charting, responding to codes, preparing medications, and caring for patients. (Compl. ¶¶ 113, 145). Even a cursory glance at the job positions that plaintiff includes in the putative class indicates that not all putative plaintiffs would be involved in this type of work. It is difficult to imagine, for example, that custodians or porters at defendants' facilities were subject to the same policies as registered nurses concerning their responsibilities during meal breaks, and that those policies resulted in similar violations of the FLSA.

This is particularly the case because not all forms of "work" are compensable. *Pruell v. Christi*, 678 F.3d 10, 14 (1st Cir. 2012). When confronted with a putative plaintiff class whose "job function . . . and daily tasks share little to no common ground," this Court finds it unlikely that common issues of law or fact would predominate. *See Manning*, 2012 U.S. Dist. LEXIS 54692 at *10. Rather, it seems likely that plaintiff's broadly defined collective action claims would become bogged down in extensive individualized analysis as to which job-related activities were performed by each individual, whether these forms of work were compensable,

and whether any compensation was paid.

Nonetheless, the Court will not dismiss plaintiff's collective action allegations at this stage. As to those putative plaintiffs employed by UMMMC, the complaint has sufficiently alleged that members of the alleged class were subject to a uniform policy that violated the FLSA. While it seems highly doubtful that the collective action claims will survive in their current form, it is premature to resolve those issues at this stage of the litigation. *See, e.g.*, *Lang v. DirectTV, Inc.*, 735 F. Supp. 2d 421, 436 (E.D. La. 2010). Accordingly, the Court will deny defendants' motion to dismiss or strike plaintiff's collective action allegations as to putative class members employed by UMMMC.

## IV.    Conclusion

For the foregoing reasons, defendants' partial motion to dismiss is GRANTED, defendants' motion to dismiss the collective action allegations is GRANTED as to those putative class members employed by defendants other than UMMMC and otherwise DENIED, and defendants' motion to stay proceedings is DENIED as moot.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: January 28, 2013